Approved: _____
SIDHARDHA KAMARAJU/NIKETH VELAMOOR
Assistant United States Attorneys

Before: HONORABLE KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York

16 MAG 1547

- - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- v. -

JULIO ALVAREZ,
CHRISTOPHER CAMPOS,
MARCO BLASIO and
GEURIS RAMOS,

Defendants.

- - - - - - - - - - - - - - - - - - - - - X

**SEALED COMPLAINT**

Violations of
18 U.S.C. §§ 1343,
1344, 1349 and 2

COUNTIES OF OFFENSE:
NEW YORK & BRONX

SOUTHERN DISTRICT OF NEW YORK, ss.:

MICHAEL BIRLEY, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

**COUNT ONE**
(Conspiracy to Commit Wire and Bank Fraud)

1. From in or about October 2012 up to and including in or about September 2013, in the Southern District of New York and elsewhere, JULIO ALVAREZ, CHRISTOPHER CAMPOS, MARCO BLASIO and GEURIS RAMOS, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and bank fraud, in violation of Title 18, United States Code, Section 1344, to wit, ALVAREZ, CAMPOS, BLASIO and RAMOS conspired to submit fraudulent applications for loans to financial institutions, including banks insured by the Federal Deposit Insurance Corporation, in connection with automobile purchases by individuals whom ALVAREZ, CAMPOS, BLASIO and RAMOS knew to be straw buyers of the automobiles.

2. It was a part and an object of the conspiracy that JULIO ALVAREZ, CHRISTOPHER CAMPOS, MARCO BLASIO and GEURIS

RAMOS, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

3. It was a further part and object of the conspiracy that JULIO ALVAREZ, CHRISTOPHER CAMPOS, MARCO BLASIO and GEURIS RAMOS, the defendants, and others known and unknown, willfully and knowingly would and did execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
(Bank Fraud)

4. From in or about October 2012 up to and including in or about September 2013, in the Southern District of New York and elsewhere, JULIO ALVAREZ, CHRISTOPHER CAMPOS, MARCO BLASIO and GEURIS RAMOS, the defendants, willfully and knowingly did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations and promises, to wit, ALVAREZ, CAMPOS, BLASIO and RAMOS submitted and caused to be submitted fraudulent applications for loans to financial institutions, including banks insured by the Federal Deposit Insurance Corporation, in connection with automobile purchases by individuals ALVAREZ, CAMPOS, BLASIO and RAMOS knew to be straw buyers of these automobiles.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT THREE
(Wire Fraud)

5.  From in or about October 2012 up to and including in or about September 2013, in the Southern District of New York and elsewhere, JULIO ALVAREZ, CHRISTOPHER CAMPOS, MARCO BLASIO and GEURIS RAMOS, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, ALVAREZ, CAMPOS, BLASIO and RAMOS submitted and caused to be submitted fraudulent applications for loans to financial institutions in connection with automobile purchases by individuals ALVAREZ, CAMPOS, BLASIO and RAMOS knew to be straw buyers of these automobiles, and in furtherance thereof, ALVAREZ, CAMPOS, BLASIO and RAMOS transmitted and caused to be transmitted interstate telephone calls, emails and wire transfers of funds.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

6.  I am a Special Agent with the FBI. This complaint is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this complaint is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Overview of the Investigation

7.  I have been involved in an investigation of a scheme related to the purchase of automobiles involving JULIO ALVAREZ, CHRISTOPHER CAMPOS, MARCO BLASIO and GEURIS RAMOS, the defendants, among other individuals. Specifically, based on the investigation and as detailed below, ALVAREZ, CAMPOS, BLASIO and

3

RAMOS fraudulently obtained and assisted others in obtaining millions of dollars in loans for the purchase of new cars from various banks and other lending institutions. Among other things, to accomplish the fraud, ALVAREZ, CAMPOS, BLASIO and RAMOS, among others, prepared, coordinated, and caused to be submitted applications and supporting documentation for automobile loans containing false or misleading information in order to induce lenders to make loans to persons to whom, and at terms on which, the lenders otherwise would not have agreed. These persons, or "straw buyers," never intended to use vehicles for their personal use and relinquished their interest in and control over the cars to ALVAREZ after the closing of the transactions.

8.  Based on my review of documents and information obtained from various automobile dealerships, lenders and individuals whom I have interviewed, I learned, among other things, that the scheme described herein involved at least approximately 20 straw purchasers, the purchase of more than approximately 200 new vehicles and more than $7,000,000 in fraudulently obtained loans from a variety of financial institutions. Most of the loans ultimately went into default.

### Background on Automobile Financing

9.  Based on my participation in the investigation, my conversations with other law enforcement agents and others, and my review of documents obtained during the investigation, I have learned, among other things, that:

   a. When individual consumers and businesses purchase automobiles from automobile dealerships, they typically have the option, if they qualify, of borrowing some part of the purchase price of the vehicle from a lender. These lenders are typically financial institutions, including institutions whose deposits are insured by the Federal Deposit Insurance Corporation ("FDIC").

   b. To apply for this financing, consumers usually submit applications through automobile dealerships at or near the time of the purchase of the vehicle. Typically, a consumer seeking to finance the purchase of a vehicle will meet with employees of the dealership, who will provide the consumer with an automobile loan application. Sometimes, the dealership employees will interview the consumer, and complete the application on behalf of the consumer. On other occasions, the consumer will complete the application himself or herself. In

4

either case, the consumer will generally be required to sign the application, and to attest to the veracity of the information contained therein.

    c. Automobile loan applications usually ask for personal and financial information concerning the purchaser of the vehicle, including among other things: the consumer's age, occupation, address, credit history, income, assets and liabilities. One of the reasons that financial institutions request this information is to evaluate the consumer's ability to repay the loan. Thus, for example, information concerning a consumer's liabilities may alter the financial institution's view as to the suitability of the consumer for a particular loan.

    d. Automobile loan applications also typically require the applicant to indicate whether the vehicle is for personal, rather than commercial, use. Generally, because vehicles that are used for commercial purposes are subject to additional wear, lenders require a higher interest rate when financing the purchase of a commercial vehicle. As a result, many dealerships and lenders require commercial purchasers of vehicles, like livery cab or delivery companies, to buy the automobiles as part of a "fleet deal." These fleet deals generally involve different, usually less favorable, financing and insurance terms than those offered to personal use consumers.

    e. Completed automobile loan applications are generally submitted electronically to the banks, often through one of two systems designed to submit one consumer application to multiple banks at the same time (collectively, the "Application Systems"). When submitted to the Application Systems, the applications are transmitted electronically to servers in Texas or New Jersey, depending on the Application System involved, before being electronically transmitted to the financial institutions. The financial institutions, at times, ask for additional information from the consumer, including, for example, income or residency verification.

### The Straw Buyer Scheme

  10. Based on my participation in the investigation, my conversations with other law enforcement agents and others, and my review of documents obtained during the investigation, I have learned, among other things, that:

5

a. During the relevant time period, JULIO ALVAREZ, the defendant, owned and operated multiple businesses in and around the New York City area. ALVAREZ's businesses included a livery cab dispatch service, an insurance brokerage, and a gas station. ALVAREZ was also an owner of several corporate entities, including an entity with a principal place of business in New York, New York ("Entity-1").

b. During the relevant time period, CHRISTOPHER CAMPOS, the defendant, worked in New Jersey as an attorney. According to a website for CAMPOS's law practice, CAMPOS is an "experienced international business attorney" with "a diverse educational and transactional background...." According to the website, CAMPOS's law practice specializes in, among other things, bankruptcy law, business litigation, and real estate law.

c. During the relevant time period, MARCO BLASIO, the defendant, worked in the financing department of a car dealership in West Islip, New York.

d. During the relevant time period, GEURIS RAMOS, the defendant, worked at a financial institution in New York City as a vice president and private client advisor. In that capacity, RAMOS earned approximately $100,000 per year.

11. Based on interviews with two cooperating witness ("CW-1" and "CW-2"),[1] I learned, among other things, the following:

a. In or about the fall of 2012, CW-1 agreed to pursue a business opportunity with JULIO ALVAREZ, the defendant, involving purchasing vehicles and leasing them to livery cab drivers. According to their plan, they would use the initial lease payments from the drivers to pay off expenses related to the vehicle purchases, including the automobile loans and insurance payments. After the loans were satisfied, the subsequent payments from the livery cab drivers would be divided

---

[1] CW-1 and CW-2 have both pleaded guilty to wire and bank fraud charges for their involvement in the auto loan scheme described in this Complaint. They are cooperating with law enforcement with the hope of receiving a more lenient sentence. To date, information provided by CW-1 and CW-2 has proven reliable, and has been corroborated, in part, by independent evidence, including, but not limited to, financial records.

6

up as profit between the various participants in the scheme. ALVAREZ advised CW-1 that they needed to acquire new vehicles because they would be more attractive to potential lessees.

   b. After speaking with an acquaintance who was employed at an automobile dealership ("Dealership-1"), CW-1 proposed to ALVAREZ that they obtain vehicles through a fleet deal. ALVAREZ rejected this approach because they only had the capital to purchase a few vehicles and they needed to obtain more vehicles in order for their proposed business to be profitable.

   c. CW-1 then spoke with CW-2, a finance manager at Dealership-1. CW-1 and CW-2 discussed, in substance and in part, how CW-1 could obtain multiple vehicles without pursuing a fleet deal or line of credit. According to CW-2, this could be accomplished by having one customer with a good credit history (a "straw purchaser") finance the purchase of multiple vehicles, which would purportedly be used for the consumer's personal use (a "straw purchase"). CW-2 further explained that the straw purchaser would apply to purchase multiple vehicles at the same time, each of which would be financed by a separate lender unaware of the other loans that the straw purchaser was obtaining to purchase additional vehicles.

   d. CW-1 subsequently described CW-2's suggested approach to ALVAREZ, who agreed to purchase cars in this manner.

   e. In or about October 2012, CW-1 and ALVAREZ described to GEURIS RAMOS, the defendant, their plan to create a leasing company for livery cab drivers, and how they could obtain new vehicles from dealerships by having one straw purchaser buy several cars at once. RAMOS agreed to participate in the scheme.

   f. On or about November 26, 2012, ALVAREZ, RAMOS and CW-1 entered into a "Shareholder Agreement of [Entity-1]." This Agreement, which was signed by ALVAREZ, RAMOS and CW-1, made RAMOS the President and Chief Executive Officer and assigned each of ALVAREZ, RAMOS and CW-1 a one-third voting interest in the company, as well as a one-third interest in any profits or losses.

   g. In or about the fall of 2012, RAMOS, ALVAREZ, and CW-1 agreed, in substance and in part, that ALVAREZ would manage the day-to-day operations of the business, including, among other things, collecting payments from the

livery cab drivers who leased the vehicles, making the loan payments to the lenders, and arranging to insure the vehicles through ALVAREZ's insurance brokerage business.

    h. Because RAMOS had a good credit history, he, ALVAREZ, and CW-1 agreed that initially, they would purchase automobiles in RAMOS's name. RAMOS provided CW-1 with the personal information called for in the automobile financing applications. CW-1 then gave that information to CW-2, who used it to complete applications. In or about October 2012, after the applications were completed, CW-1 accompanied RAMOS to Dealership-1, where RAMOS signed multiple loan applications in which false statements were made including about the use of the vehicles, i.e. that they would be used for RAMOS's personal use. In or about October and November 2012, CW-1 accompanied RAMOS to at least three automobile dealerships at which RAMOS purchased additional new automobiles by providing false statements in the relevant loan applications.

    i. ALVAREZ and CW-1 later agreed that they should expand the business, and ALVAREZ indicated that he knew other individuals with good credit histories who could purchase vehicles on their behalf. In or about 2013, ALVAREZ introduced CW-1 to another individual ("Straw Purchaser-1"), and explained, in substance and in part, the business model for their livery cab leasing business to Straw Purchaser-1. After Straw Purchaser-1 agreed to participate, ALVAREZ instructed Straw Purchaser-1 to accompany CW-1 to a car dealership. In or about January 2013, CW-1 and Straw Purchaser-1 went to Dealership-1, where, with CW-1 and CW-2's help, Straw Purchaser-1 submitted multiple loan applications containing false representations, including that the vehicles were for the personal use of Straw Purchaser-1 and about the income of Straw Purchaser-1, to various lenders, and purchased several new vehicles at the same time.[2]

    j. In or about January and February 2013, CW-1 accompanied Straw Purchaser-1 to multiple dealerships, including a dealership in West Islip, New York ("Dealership-2") where MARCO BLASIO, the defendant, worked, to purchase additional cars. At Dealership-2, BLASIO assisted CW-1 and Straw Purchaser-1 in preparing and submitting false loan applications

---

[2] Based on information I obtained from Straw Purchaser-1, I learned that, at all relevant times, Straw Purchaser-1 earned no more than approximately $11,000 per year as a school aide.

8

to obtain additional vehicles. In total, in or about January and February 2013, Straw Purchaser-1 submitted false loan applications in connection with the purchase of at least 18 vehicles purportedly for Straw Purchaser-1's personal use.

        k. In or about March 2013, after completing the above-described straw purchases, CW-1 and a supervisor at Dealership-1 (the "Supervisor") met with an attorney for Dealership-1 who advised them that they could not finance the purchase of automobiles in the manner in which they had been doing. The Supervisor then told CW-1 and CW-2 that Dealership-1 would not do any more deals of this type. CW-2 then referred CW-1 to BLASIO for the purpose of doing more of the same type of transactions at Dealership-2. CW-1 advised BLASIO that the Supervisor did not want to do any more of these deals at Dealership-1. BLASIO agreed to facilitate additional straw purchases at Dealership-2.

### CAMPOS's Involvement in the Automobile Loan Scheme

        l. In or about 2013, following the events described above, ALVAREZ and CW-1 met with CHRISTOPER CAMPOS, the defendant, at one of ALVAREZ's businesses in New York, New York. At that meeting, ALVAREZ and CW-1 described the scheme to CAMPOS. CAMPOS agreed to recruit straw purchasers for the scheme, in exchange for a share of the profit from the livery business that RAMOS, ALVAREZ, and CW-1 had formed.

        m. Soon after this meeting, CW-1 met with CAMPOS and one of CAMPOS's relatives ("Straw Purchaser-2"). CW-1, CAMPOS, and Straw Purchaser-2 went to Dealership-2, where they met with BLASIO. There, in CAMPOS's presence, Straw Purchaser-2 signed several materially false applications for financing the purchase of multiple vehicles, which BLASIO submitted to various financial institutions. As a result of these applications, Straw Purchaser-2 was able to finance the purchase of several new cars at Dealership-2, which were purportedly for Straw Purchaser-2's personal use.

        n. In or about the spring of 2013, BLASIO introduced CW-1 to an employee ("CC-1") at another automobile dealership ("Dealership-3") and BLASIO indicated, in substance and in part, that CC-1 would help CW-1 engage in the same automobile loan scheme at Dealership-3. With CC-1's help, CW-1 arranged for multiple straw purchasers to finance the purchase of several new cars from Dealership-3 purportedly for the straw purchasers' personal use.

o. In addition to the straw purchasers with whom CW-1 worked, ALVAREZ personally accompanied other straw purchasers to automobile dealerships, at which ALVAREZ and the straw purchasers acquired new automobiles by submitting false loan applications. During the course of the fraud, ALVAREZ did visit car dealerships that refused to participate in the scheme.

p. After the above-described straw purchases, in or about 2013, CW-1 learned from some of the straw purchasers and BLASIO that some of the lenders were complaining about missed loan payments. CW-1 then confronted ALVAREZ, who stated, in substance and in part, that one of his other businesses was struggling, and that this had prevented ALVAREZ from making some of the loan payments.

q. During the course of the scheme, CW-1 received referral fees, which are often referred to in the industry as "bird dogs," from car dealerships that sold cars in straw purchases arranged by CW-1. For arranging the straw purchases, CW-1 received a total of at least approximately $28,000 in such referral fees.

12. Based on information I obtained from another individual ("Straw-Purchaser-3"), I learned the following:

a. In or about March 2013, Straw Purchaser-3 was recruited by CHRISTOPHER CAMPOS, the defendant, to purchase cars to be used by others as livery cabs. CAMPOS subsequently introduced Straw-Purchaser-3 to JULIO ALVAREZ, the defendant. ALVAREZ explained that Straw Purchaser-3 would earn approximately $300,000 from the "investment."

b. Straw Purchaser-3 completed a credit application and gave it to ALVAREZ and CAMPOS. In or about May 2013, Straw Purchaser-3 "purchased" approximately 24 cars at multiple dealerships in New Jersey, and in connection with those purchases, submitted loan applications that falsely stated, among other things, that Straw Purchaser-3 intended to use those vehicles for Straw Purchaser-3's personal use.

c. In the course of those purchases, Straw Purchaser-3 learned that, as a resident of New Jersey, the cars purchased in the name of Straw Purchaser-3 could not be registered to the address of ALVAREZ's business in New York. Straw Purchaser-3 contacted ALVAREZ, who instructed Straw Purchaser-3 to claim ALVAREZ's business address in New York, New

York as Straw Purchaser-3's home address, which Straw Purchaser-3 agreed to do.

d. In or about February and March 2014, Straw Purchaser-3 was contacted by various lenders because loan payments were not being made on the vehicles Straw Purchaser-3 had acquired in connection with the scheme. In subsequent conversations with ALVAREZ and CAMPOS, ALVAREZ instructed Straw Purchaser-3 not to discuss the scheme with others because someone may be recording such conversations. ALVAREZ also told Straw Purchaser-3 that there should be fewer communications between them by email or texting. On one occasion, CAMPOS got upset with Straw Purchaser-3 because Straw Purchaser-3 had told one lender that the cars were not being used personally by Straw Purchaser-3. CAMPOS further instructed Straw Purchaser-3 in sum and substance not to speak with the FBI.

**Additional Records and Evidence of the Automobile Loan Scheme**

13. Based on my review of records obtained from various automobile dealerships, including Dealership-1, Dealership-2, Dealership-3 and another dealership located in New Jersey ("Dealership-4") and various financial institutions, I learned the following:

a. In or about October and November 2012, GEURIS RAMOS, the defendant, signed applications for loans to finance the purchase of numerous personal-use vehicles. Most of these loan applications falsely stated that the intended use for the vehicles was personal and most of these loan applications falsely asserted that RAMOS's annual income was $300,000. In one of the loan agreements between RAMOS and a lender, RAMOS agreed, *inter alia*, "not to use the [v]ehicle for hire, livery, or lease" and in another agreement, RAMOS agreed "not...to carry passengers for hire." Ultimately, RAMOS received loans from numerous lenders to finance the purchase of new vehicles at multiple dealerships.

b. In or about January and February of 2013, Straw Purchaser-1 signed applications for loans to finance the purchase of numerous personal-use vehicles. Most of these loan applications falsely stated that the intended use for the vehicles was personal and most of these applications falsely asserted that Straw Purchaser-1's annual income was $75,000. Ultimately, Straw-Purchaser-1 fraudulently received loans from numerous lenders to finance the purchase of new vehicles at multiple dealerships.

c. In or about April and May 2013, Straw Purchaser-2 signed applications for loans to finance the purchase of numerous personal-use vehicles. Most of these loan applications falsely stated that the intended use for the vehicles was personal. The applications also provided varying false amounts for Straw Purchaser-2's annual income, ranging from $26,000 to $60,000 per year. Ultimately, Straw Purchaser-2 fraudulently received loans from numerous lenders to finance the purchase of multiple new vehicles.

d. In or about December 2012, another individual ("Straw Purchaser-4") financed the purchase of at least four vehicles from Dealership-1. In applications for loans to finance the purchase of these vehicles, Straw Purchaser-4 was falsely listed as having an annual income of approximately $144,000. In or about December 2012 and January 2013, Straw Purchaser-4 signed applications for loans to finance the purchase of additional vehicles from an automobile dealership located in the Bronx, New York ("Dealership-5"). Most of these loan applications falsely stated that the intended use for the vehicles was personal and falsely asserted that Straw Purchaser-4's annual income was $78,000.

e. Shortly after the purchase of numerous vehicles, including multiple vehicles acquired in the names of RAMOS and Straw Purchaser-1, JULIO ALVAREZ, the defendant, routinely signed and caused to be signed documents registering the vehicles with the New York Department of Motor Vehicles in the names of companies controlled by ALVAREZ, including Entity-1. In these documents, which named the straw purchasers as current owners, ALVAREZ stated that the vehicles were not registered for personal use.

14. Based on my training and experience, my participation in this investigation, and my conversations with other law enforcement agents and others, I know that the deposits of most of the financial institutions that extended loans as a result of this scheme were insured by the FDIC.

15. In or about September 2015, GEURIS RAMOS, the defendant, gave sworn testimony to the Financial Industry Regulatory Authority. During that testimony, RAMOS acknowledged, among other things, obtaining vehicles after being approached by JULIO ALVAREZ, the defendant, and CW-1, but denied having a clear understanding as to why they needed him to get the vehicles. RAMOS denied ever being a partner in any of

ALVAREZ's companies, and further denied ever having any affiliation with Entity-1.

WHEREFORE, the deponent respectfully requests that warrants be issued for the arrests of JULIO ALVAREZ, CHRISTOPHER CAMPOS, MARCO BLASIO and GEURIS RAMOS, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

*/s/ Michael Birley*
MICHAEL BIRLEY
Special Agent
Federal Bureau of Investigation

Sworn to before me this
7th day of March, 2016

*/s/ Kevin Nathaniel Fox*
HONORABLE KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York